**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


ELIZABETH C. SNIDER, Individually  :
and as Executrix of the Estate of  : CIVIL ACTION
DANIEL A. SNIDER, and              :
LEE W. SNIDER, a minor, by his     :
mother, ELIZABETH C. SNIDER        : NO.  13-CV-2949
                                   :
            Plaintiffs             :
                                   :
        vs.                        :
                                   :
STERLING AIRWAYS, INC., and        :
CONTINENTAL MOTORS, INC.,          :
                                   :
            Defendants             :


## MEMORANDUM AND ORDER


**JOYNER, J.**                                    **August 29, 2017**


    Pursuant to Fed. R. Civ. P. 59, Defendant Continental

Motors, Inc. filed a Motion for New Trial and to Alter or Amend

the Judgment entered on February 21, 2017, following a jury

verdict in favor of Plaintiffs and against the moving defendant

in the amount of $2,753,048.49.  After thorough review of the

trial record, this motion shall be largely denied for the reasons

set forth below.

## Case History

    Given that we have previously written numerous opinions

outlining the historical background of this case, at this time we

shall just briefly summarize the underlying facts relevant to the

motion presently before us.  This lawsuit arose out of the tragic death of Daniel Snider, a United States Forest Service employee who was killed in the crash of a single-engine aircraft on June 21, 2010 as it was approaching the William T. Piper Memorial Airport in Lock Haven, Pennsylvania.  Mr. Snider was killed, along with another Forest Service employee and the pilot of the aircraft, as the result of the failure of the plane's engine. That engine was manufactured by Defendant Continental Motors, Inc.  The aircraft, a 1973 Cessna T210L, was owned, operated and maintained by Defendant Sterling Airways, Inc., of Hornell, New York.

The gist of the Plaintiffs' complaint in this matter is that the accident was caused by the negligence, gross negligence, recklessness and/or strict liability on the part of the defendants in the manufacture, maintenance, and/or operation of the accident airplane, its engine and component parts.  This action was tried before the undersigned commencing on January 23, 2017 and concluding on February 16, 2017, when the jury rendered a verdict in favor of the Plaintiffs and against Continental Motors only[1] in the amount stated above.  Alleging a variety of reasons and errors in evidentiary rulings and the admission and/or prohibition of evidence, Continental now moves for a new

---

[1]  While the jury did find that Defendant Sterling Motors had breached its contract with the United States Forest Service and was negligent, it determined that Sterling's negligence and breach were not factual causes of the accident.

trial and/or to alter or amend the judgment entered on the jury's verdict.

## Standards Governing Motions Under Rule 59

The language of Fed. R. Civ. P. 59 is fairly broad. Specifically, it states, in relevant part:

**Rule 59. New Trial; Altering or Amending a Judgment**

**(a) In General.** (1) *Grounds for New Trial.* The court may, on motion, grant a new trial on all or some of the issues - and to any party - as follows:

> (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or

> (B) after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

> ...

**(b) Time to File a Motion for a New Trial.** A motion for a new trial must be filed no later than 28 days after the entry of judgment.

> ...

**(d) New Trial on the Court's Initiative or for Reasons Not in the Motion.** No later than 28 days after the entry of judgment, the court, on its own, may order a new trial for any reason that would justify granting one on a party's motion. After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion. In either event, the court must specify the reasons in its order.

**(e) Motion to Alter or Amend a Judgment.** A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.

A new trial may therefore be granted where there was

substantial error in the admission or exclusion of evidence; error in the court's instructions to the jury; where the jury's verdict was inadequate or excessive; or where the verdict is against the weight of the evidence. Marder v. Conwed Corp., 75 F.R.D. 48, 54 (E.D. Pa. 1977)(citing Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S. Ct. 189, 85 L. Ed. 147 (1940) and 5A *Moore's Federal Practice* P50.03[2] at 2334). A new trial may also be granted where the evidence was legally insufficient to go to the jury. Id.

In general, the ordering of a new trial is committed to the sound discretion of the district court. Bonjourno v. Kaiser Aluminum & Chemical Corp., 752 F.2d 802, 812 (3d Cir. 1984). But, "[w]hile a court may grant a new trial under Rule 59 'for any reason for which a new trial has heretofore been granted in an action at law in federal court,' it should do so only when 'the great weight of the evidence cuts against the verdict and a miscarriage of justice would result if the verdict were to stand,'" or where the verdict "shocks the conscience." Leonard v. Stemtech International, Inc., 834 F.3d 376, 386 (3d Cir. 2016)(quoting Rule 59(a)(1)(A) and Springer v. Henry, 435 F.3d 268, 274 (3d Cir. 2006)); Chinniah v. East Pennsboro Township, No. 14-3355, 2015 U.S. App. LEXIS 3659, *3, 602 Fed. Appx. 558, 559 (3d Cir. March 9, 2015)(quoting Marra v. Philadelphia Housing Authority, 497 F.3d 286, 309, n. 18 (3d Cir. 2007)).

4

Hence, the court's "review of a jury's verdict is limited to determining whether some evidence in the record supports the jury's verdict," as "[a] jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict." LePage's, Inc. v. 3M, 324 F.3d 141, 146 (3d Cir. 2003); Swineford v. Snyder County, 15 F.3d 1258, 1265 (3d Cir. 1994). Further, "[a] district court's power to grant a new trial is limited 'to ensure that it does not substitute its judgment of the facts for the facts and the credibility of the witnesses for that of the jury.'" Stemtech, supra,(quoting Delli Santi v. CNA Insurance Cos., 88 F.3d 192, 201 (3d Cir. 1996)). Indeed, in reviewing a motion for a new trial, the court is required to view the evidence in a light most favorable to the non-moving party and draw every reasonable and fair inference therefrom which supports the jury's award. Frank C. Pollara Group, LLC v. Ocean View Inv. Holding, LLC, 784 F.3d 177, 184 (3d Cir. 2015); Willmore v. Willmore, Civ. A. No. 95-0803, 1996 U.S. Dist. LEXIS 5947, *9 - *10 (E.D. Pa. May 2, 1996); Gans v. Gray, 612 F. Supp. 608, 622 (E.D. Pa. 1985).

## Discussion

*A.  Sufficiency of Evidence as to Material Hardness*

Continental Motors' first argument essentially mirrors one of the arguments which it raised in its Renewed Motion for Entry

5

of Judgment in its Favor as a Matter of Law.  That motion was recently denied and the reasons therefor set forth in our Memorandum and Order of June 28, 2017.  Specifically, CMI here re-asserts that the jury's verdict is against the great weight of the evidence because the plaintiffs ostensibly offered no evidence to prove that any alleged defect in material hardness caused the accident aircraft's engine to fail.  Again, in light of the evidence presented at trial by all of the parties, we respectfully disagree.

As is not at all unusual in negligence/product liability cases such as this one, the jury here was tasked with assessing two competing theories as to the underlying cause of the failure of the No. 2 cylinder on the accident airplane's engine.[2]  In essence, it was the plaintiffs' theory that the No. 2 cylinder failed because of insufficient "hardness" of the exhaust valve guide, whereas it was Defendant CMI's belief that the breakdown was caused by overheating of the cylinder as a consequence of Sterling Airways' failure to follow the correct manuals and maintenance directives and to install the correct rocker arms and/or bushings at the time of the 2004 engine overhaul.

Consistent with their theory of the case, the plaintiffs presented the testimony of several witnesses with expertise in

---

[2]  Indeed, there was no dispute as to what part of the engine initiated the failure sequence.

metallurgy, aircraft accident investigation, civil, materials, and mechanical engineering and materials failure analysis, among others.  One of those witnesses, Colin Sommer, testified that Part #636242, which was in the No. 2 cylinder at the time of the accident and which is believed to have been the root cause of the crash, is an exhaust valve guide bearing a Continental part number.  It was depicted by Continental as one of their component parts and there is no indication anywhere that it was ever made by anyone else.  The exhaust valve guides that were installed in the accident engine in 2004 were manufactured in December 2003 by Roderick Arms & Tool, an FAA-approved supplier for Continental Motors under its Quality System.[3]  (N.T. 1/25/17, 96-98; N.T. 2/8/17, 27).  Those guides did not bear a Roderick part number and in fact, Roderick could not legally sell those parts to the public or anyone other than Continental because that part is made only for Continental.  (N.T. 1/25/17, 108-109; Pl's Exhibits 239, 245, 253).

_____

[3]  As several of Continental's witnesses explained, in order to obtain approval from the Federal Aviation Administration ("FAA") to manufacture an aircraft engine, CMI, like all manufacturers, was first required to create a design for its engine and then apply to the FAA for approval of that design. (N.T. 2/8/17, p. 13).  Once that process is completed and the FAA grants approval and issues a Type Certificate, it falls to CMI as the manufacturer, to submit a plan to the FAA's Manufacturing Inspection District Office ("MIDO") on how it intends to control its manufacturing and quality to ensure that every product is like a duplicate to what was Type Certified.  (N.T. 2/8/17, pp. 14-15).  As in the usual case, after CMI defined its quality system and the FAA's audit of that system found it to be satisfactory, in this case too the FAA awarded a Production Certification for the production of the engine, which in this case is the TSIO-520-H.  Thereafter, the FAA conducts periodic audits and inspections of CMI's manufacturing facilities and those of its suppliers to ensure ongoing compliance with the Type Certificate. (N.T. 2/8/17, pp. 16-18).

According to Mr. Sommer, "[p]art of the design of that valve guide from Continental is that it has to meet a certain hardness requirement." (N.T. 1/25/17, 137). That specification is Rockwell B Hardness 75 to 90.[4] (N.Y. 1/25/17, 138; N.T. 2/1/17, 140-143). In an effort to determine why the valve guide wore in the manner in which it did, Mr. Sommer and another of Plaintiffs' expert witnesses, William Carden, in tandem with the McSwain Engineering laboratory performed a series of Rockwell B[5] hardness tests on the guides on the first five cylinders on the accident aircraft's engine. Those tests resulted in readings of 68 on the No. 1 guide, 71.6 on the No. 2 guide, 86.9 on the No. 3 guide, 68.4 for the No. 4 guide and 84.1 for the No. 5 guide.[6] (N.T. 1/25/17, 139-140; 2/1/17, 145-156). From these measurements,

---

[4] As Mr. Sommer, among others, explained: "[h]ardness is measured in different scales." (N.T. 1/25/17, p. 138). "Rockwell Hardness is a hardness-testing technique and a scale for measuring hardness of materials," for which "a specific set of equipment" and "specific procedures" "are outlined in the ASTM, which is the American Society for Testing and Materials." (Testimony of William Carden, 2/1/17, pp. 140-141). Other scales for measuring the hardness of materials include the HR15T, HR30T and Brinell scales. (N.T. 2/1/17, pp. 184-190). The different scales are distinguished on the basis of different-sized indenters making different-sized indentations into the material being tested. (N.T. 2/1/17, pp. 185-188).

[5] Using a Brinell hardness testing machine, a small, hard metal sphere is pressed into the side of the material being tested resulting in a small dimple. The dimensions of that dimple and the force used to make it are then measured and from that a number denoting the hardness of the material is generated. (N.T. 1/25/17, 136-137; 2/1/17, 139-141).

[6] Mr. Carden took three measurements on the exhaust valve guides and from those readings calculated the mean as well as a standard deviation. The final readings are the calculated means. (N.T. 2/1/17,147-148).

both Mr. Sommer and Mr. Carden concluded that the Continental[7] exhaust valve guides were out-of-compliance with its own hardness specification.  (N.T. 1/26/17, 100, 155, 160-161; N.T. 2/2/17, 62-64).

In addition, Mr. Sommer, Mr. Carden and one of CMI's witnesses - Michael Ward, all testified that the cylinder assemblies that were manufactured in December 2003 and installed into the accident aircraft a few months later during the overhaul, were made from a material called Ni-Resist Type 1, which is a cast-iron alloy designed to withstand operating temperatures well above 750 degrees on a consistent basis and more often between 1000 and 1,300 degrees. (N.T. 1/25/17, 141-142; N.T. 2/1/17, 138-139; N.T. 2/8/17, 19, 28, 200-205).

Under Continental's quality control system, it provides a form "Certificate of Compliance" to its suppliers for completion and inclusion with the shipments of all of the product which it has ordered. (N.T. 2/8/17, 46-52; CMI Exhibit 3347).  In completing those compliance certificates, the supplier is verifying that the parts which Continental ordered and which it

---

[7]  As we stated in footnote 6 to our June 28, 2017 Memorandum and Order, the guides in the No. 3 and No. 5 cylinders had been replaced in 2007 with guides that were manufactured by ECI, another company and unlike the Continental, finish-in-place guides, the ECI guides were pre-reamed or pre-finished.  (N.T. 1/25/17, 139; N.T. 1/26/17, 18-20; N.T. 2/1/17, 54).  Since the guides had to be extracted from the cylinders to conduct the tests and that is a difficult procedure, the Nos. 1, 2, and 4 guides were removed because they were in close proximity to one another.  The Nos. 3 and 5 guides were already loose and didn't have to be extracted.  The No. 6 guide was left in place and was not tested.  (N.T. 1/26/17, 162; N.T. 2/1/17, 145-146).

manufactured for Continental were produced in accordance with CMI's specifications, drawings etc. and that they are as they should be.  (N.T. 2/8/17, 46).  Upon receipt of shipments of valve guides from Roderick and following its own inspection protocol as outlined on its internal "Material Acceptance Data (MAD) Sheet," CMI inspects a designated number of random samples[8] from the various lots delivered to ensure that the guides possess the required features and hardness and are otherwise in compliance with its specifications.  (N.T. 1/26/17, 26-28; N.T. 2/8/17, 24-26, 36-44; Pl's Exhibit 291).  If any of the samples tested fail to meet specifications, the entire lot is to be rejected and then set aside for further screening.  (N.T. 2/8/17, 39-40).  (Pl's Exhibits 294, 296, 297; CMI's Exhibits 3345, 3346, 3347, 3348; N.T.; N.T. 2/8/17, 26-28, 36-56).

At trial however, Plaintiffs produced evidence that despite these procedures, on several lots of exhaust valve guides received from Roderick in April 2002, September 2003 and in January 2004, the Continental inspectors accepted batches of exhaust valve guides but either did not fill out the hardness

----

[8] Sampling inspection is an FAA-approved procedure for performing inspections of this kind and is used not only in the manufacturing area where parts are being produced but also in receiving. It is a methodology originally derived back in World War II during military production and has since evolved into an industry standard.  Specifically, using statistically-based tables and charts and depending upon the size of the lot to be inspected, a set number of random samples of product are pulled and sampled.  All of the features on the sampled parts are inspected and tested for compliance with the designated specifications. ( N.T. 1/26/17, 26-30; N.T. 2/8/17, 26-27).

designation on the data sheets as required or, in one case, approved the lot despite it having a hardness reading of Rockwell B 73, rather than the required minimum of 75. (N.T. 1/26/17, 27-35; N.T. 2/8/17, 37-44, 53-56, 81-88; Pl's Exhibits 294, 296, 297; CMI Exhibits 3345, 3346, 3347, 3348).

Plaintiffs additionally adduced evidence that despite the fact that Continental's specifications dictated that the Rockwell B scale be used, it was not uncommon for its inspectors to employ different hardness scales such as the HR 15 and HR 30 and then convert those readings to a Rockwell B reading. (N.T. 2/1/17, 183-198; N.T. 2/8/17, 77-82).

To reiterate, under the prescribed standards for overturning a verdict or granting a new trial, we are charged with reviewing the jury's verdict to ascertain whether there is some evidence in the record to support it. In doing so here, we find that the foregoing evidence is more than sufficient to warrant a finding by the jury in this case that the exhaust valve guide which was installed in the No. 2 cylinder did not satisfy the requisite hardness minimums set by Defendant Continental itself.

As for the second prong, that is, whether Plaintiffs made a sufficient showing that the subject accident was caused by that inadequate hardness, we likewise find that adequate evidence was produced to sustain the jury's conclusion that it was.

Again, Plaintiffs' expert witness Colin Sommer explained

that the purpose behind hardening is to increase wear resistance and that exhaust valve guides in particular are subject to a great deal of heat and wear – more so than intake valves. (N.T. 1/26/17, 17-18, 87). He stated that his examination of the accident aircraft's engine showed extensive damage in that holes had been punched through the top of the crank case in multiple locations, and that he observed cracking and evidence of catastrophic failure from the engine's external side. (N.T. 1/25/17, 126, 128). He said it was obvious from his first look at the No. 2 cylinder, that there had been a "major catastrophic destruction of the Number 2 piston" and "[t]here [we]re some more components of that piston that were all found in the bottom of the oil pan and throughout the engine." (N.T. 1/25/19, 128).

Mr. Sommer further testified:

> "What the metallurgical examination showed was that there was evidence of fatigue on this fracture, meaning that as the valve was riding up and down inside the cylinder ... the valve got crooked because of wear that was found between the valve guide and the valve system. So as the valve gets crooked, it starts to bang up against the valve seat, which is the area where it seals, and eventually broke the head off of that valve. Once the head broke off, it's rolling around inside the cylinder while the piston is traveling up and down inside there at 22 times per second. ... The inside of the cylinder is all destroyed and beat up and damaged from the pieces of the piston and also the head of the valve that was rolling around inside there. So that resulted in a lot of catastrophic destruction inside the engine. As one piston becomes destroyed, the ... Number 2 connecting rod was very heavily damaged, and actually was torn off of the crankshaft. It beat into the side of the crankshaft. It punched a hole into the side of the case. It broke the connecting rod bolt off.

...

        So all the other damage that we saw was a result of the
        destruction of the Number 2 piston.  The destruction of the
        Number 2 piston was the result of the failure of the Number
        2 exhaust valve head, and the Number 2 exhaust valve head
        was a failure of the Number 2 exhaust valve.  The wear that
        had occurred on that valve guide – sorry, caused the failure
        which then cascaded to the destruction of the rest of the
        engine."

(N.T. 1/25/17, 128-131).  Finally, Mr. Sommer conclusively

attested: "My analysis revealed that we had a broken guide

because the guide was soft.  The broken guide caused a broken

valve, which broke the engine."  (N.T. 1/26/17, 100).

     In addition to Mr. Sommer's testimony, William Carden said

that he too observed two cracks in the Number 2 exhaust valve

guide from the top of the valve guide down into and along the

right hand side of the guide.  He found these cracks to be very

flat rather than rough, demonstrating that the initial fracture

occurred and separated the top of the valve guide, and then the

valve guide began rubbing on top of itself or hammering itself

flat.  (N.T. 2/1/17, 126-131).  Mr. Carden also saw fatigue

striations in the course of his examination of the No. 2 exhaust

valve guide.  These striations, which appear as ridges or lines,

are indicative of fatigue cracks that propagate incrementally

over a period of time. (N.T. 2/1/17, 135-137).  Instead of

breaking all at once in a sudden failure like an overload event,

a fatigue crack begins as a tiny crack which results at lower

loads but incrementally grows and moves forward as material is

repeatedly loaded and unloaded generating the striations. Eventually, a break can occur such as happened in this case where the valve guide broke and rubbed on top of itself producing the flat areas which were observed. (N.T. 2/1/17, 136-137).

Mr. Carden also testified that he took measurements of the exhaust valve guides, including the inner diameters, in the accident aircraft's engine using a coordinated measuring machine and touch probe. (N.T. 2/1/17, 113-115, 121). He found that the inner diameter of the No. 2 exhaust valve guide was very large, especially at the opening into the barrel but was much smaller at the top than it was at the bottom and was much larger than the rest of them. He also noted that there was quite a bit of wear on the bottom parts of the valve guides. (N.T. 2/1/17, 121-123).

In measuring the diameter of the valve systems with handheld blade and laser micrometers, Carden found that the clearance of the No. 2 exhaust valve guide was much larger than all of the others and in fact, was some 10 times the maximum clearance of the return to service clearance limits of 7/1000 of an inch on the bottom of the guide, such that it was bell-shaped. (N.T. 2/1/17, 124-125). Like Mr. Sommer, Mr. Carden also testified that it is a fundamental engineering concept that hardness and wear are directly related. (N.T. 2/2/17, 22-23).

And as we noted in our June 28th Memorandum, "additional evidence regarding the sequence of events leading to the engine

failure was provided by one of the defense witnesses, Dr. John
Morris, an expert in metallurgy, material science and failure
analysis."  As this witness observed, everyone agreed as to what
the sequence of events leading to the failure was although they
disagreed as to what caused that sequence to commence.  As the
valves, which are situated in the cylinders, open and close, they
pass through the valve guide.  Dr. Morris explained that as the
valves move back and forth,

> "there's always going to be some wear.  In this case, the
> wear became very severe rather quickly.  As it becomes
> severe, the valve becomes kind of loose in the valve guide
> and that creates a much worse mechanical situation because
> it's vibrating back and forth.  When something vibrates back
> and forth, it creates a cyclic load, which tends to make
> materials fail in a phenomenon called fatigue.  What will
> happen is that under cyclic loads the material will be
> damaged, the damage will accumulate and finally a crack will
> form where the damage accumulates.
>
> Here, several cracks formed in the valve guide.  That would
> be this third little thing here (indicating), and the top of
> the valve guide broke off.  At this point the valve is
> really free to move, and the fatigue crack developed down at
> the base of the valve and broke off the head of the valve
> you see in the final failure.
>
> I don't go any further because once that had happened, the
> cylinder failed, parts of the engine came apart, and that
> was when the engine stopped operating.  So I think everyone
> agrees that the cause of this failure was exaggerated wear
> of this valve guide causing its fatigue failure, then the
> fatigue failure of the valve, and the subsequent failure of
> the engine."

(N.T. 2/8/17, 151-152).

In reviewing this evidence in the light most favorable to
the Plaintiffs as the non-movants and drawing every reasonable

and fair inference therefrom, we again conclude that it is more
than ample to support and justify the jury's findings and award
in this matter.  Consequently, Defendant CMI's motion for a new
trial on the basis of the insufficiency of the evidence as to
causation and hardness is denied.

   *B.  Negligence of Sterling Airways*

   Defendant Continental next challenges the jury's verdict in
favor of Defendant Sterling Airways.  More specifically,
Continental claims that "[t]he evidence at trial conclusively
established that Sterling's many maintenance deficiencies, and
its failures to comply with CMI's service recommendations and
related negligence, were the sole cause of the engine failure
that led to the accident or, at the very least, were a
considerable contributing factor to that engine failure."  (CMI's
Brief in Support of Motion for New Trial and to Alter or Amend
the Judgment, at p. 12).

   We agree that Continental produced sufficient evidence to
support a finding by the jury that Sterling was negligent in
disregarding certain of CMI's maintenance recommendations and
that it could have done things better in maintaining the accident
aircraft.  Indeed, in its verdict that is precisely what the jury
did find - that Sterling Airways breached its contract with the
U.S. Forest Service and was negligent in some regards but that
despite this, neither the breach nor Sterling's negligence were

factual causes of the accident.  These facts notwithstanding,
there was also more than enough evidence produced at trial that
Continental's negligence was greater and was in fact the
proximate cause of the June 21, 2010 crash to sustain the
verdict.  On this point there was testimony from a number of
witnesses: Colin Sommer, Rodney Doss, Allen Fiedler, James Caneen
and John Goglia regarding the maintenance procedures performed by
Sterling, what manuals, directives and/or service advisories it
followed and was and/or was not required to follow in fulfilling
its maintenance obligations, and what parts were and/or should
have been in the aircraft at the time that it crashed.  The gist
of these witnesses' testimony is that, contrary to Continental's
assertions: (1) the rocker arms, bushings and lifters in the
engine at the time of the accident had been providing sufficient
lubrication and did not contribute to the breakdown of the
engine; (2) that Sterling Airways' Director of Maintenance, David
Crane, followed the current manuals at the time he performed the
2004 engine overhaul (3) that in performing the maintenance on
the 1973 Cessna, Mr. Crane followed those service bulletins,
advisory circulars and instructions for continued airworthiness
which he was required to follow under the Federal Aviation
Regulations (FARs); and (4) that Sterling otherwise met all of
the required maintenance tasks for the subject aircraft.  (N.T.
1/26/17, 36-48, 55-62, 64-65; N.T. 1/31/17, 181-182, 184-203;

N.T. 2/1/17, 7-10, 22-25; 2/2/17, 130-131; N.T. 2/3/17, 52-60, 68-73, 75-84, 110; 2/6/17, 35-46).

Here, the thrust of CMI's argument is that the jury credited the testimony from the Plaintiffs' and Sterling's witnesses and disregarded or gave less weight to the testimony and evidence which it produced.  That of course, is precisely what a jury is expected to do – weigh the evidence and the credibility of the witnesses and make a determination as to the facts.  That the jury performed its function in a manner which displeases Continental and reached a decision with which Continental disagrees is *not* a reason to disturb the verdict.  Accordingly, given that we find the verdict to be supported by the evidence presented, the motion to overturn it and/or order a new trial on the basis of Sterling's liability is also denied.

C. *Application of GARA*

One more time, CMI reiterates its previously-raised and rejected arguments on the basis of the General Aviation Revitalization Act of 1994, a statute of repose which is codified at the notes to 49 U.S.C. §40101.  This Act, colloquially known as "GARA," prohibits the commencement of a "civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft ... against the manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part... if

18

the accident occurred..." more than 18 years after "(A) the date of delivery of the aircraft to its first purchaser or lessee, if delivered directly from the manufacturer; or (B) the date of first delivery of the aircraft to a person engaged in the business of selling or leasing such aircraft..."  GARA §§2(a)(1)(A), (B) and 3.  Notwithstanding this general prohibition, Section 2(a)(2) of GARA includes a "rolling provision" which provides that:

> (2) with respect to any new component, system, subassembly, or other part which replaced another component, system, subassembly or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage, after the applicable limitation period beginning on the date of completion of the replacement or addition.

This provision has been construed to mean that "a new eighteen year period begins when a new part is added to an aircraft if this part is alleged to have caused an accident."  Robinson v. Hartzell Propller, Inc., 326 F. Supp. 2d 631, 660 (E.D. Pa. 2004).

In renewing its GARA argument, Continental submits that it is entitled to relief for two reasons.  First, since in CMI's mind the finding by the jury that its negligence proximately caused the accident should be set aside, it did not cause the accident and the plaintiffs' claims against it remain barred.  Second, CMI again claims that it was not the cylinder assembly but the exhaust valve guide which caused the accident.  Since the

exhaust valve guide was manufactured for it by Roderick, the rolling provision was improperly applied and it is entitled to reversal of the verdict.

Given that we have declined to set aside the jury's finding that Continental's negligence was the proximate cause of the accident, we likewise decline to overturn the verdict for the reason that causation has not been shown under GARA. As for the second prong of Moving Defendant's argument, we re-state the conclusions previously articulated in our June 28, 2017 Memorandum opinion denying its Renewed Motion for Entry of Judgment Pursuant to Rule 50(b). That is, there was clear evidence produced at trial that the cylinders which were installed in the accident aircraft's engine during the 2004 overhaul were manufactured and sold by Continental Motors.

While it is true that those cylinders contained exhaust valve guides which had been manufactured for Continental by Roderick Arms & Tool, those guides had been designed by Continental, were assigned a Continental part number (#636242) and could not be manufactured or sold to any entity or company other than CMI. (N.T. 1/25/17, 94-99, 101, 108-123; N.T. 2/1/17, 54, 36-39; N.T. 2/3/17, 82, 104; N.T. 2/8/17, 19-28; Pl's Exhibits 239,245, 249, 253). The exhaust valve guides that were installed in the cylinder assemblies in December 2003 were "finish" or "ream-in-place" valve guides which required that they

be heated up and then pushed into the cylinder head using a press and reamed into place.  (N.T. 1/25/17, 103-104; 2/1/17, 74-76). As we explained in footnote 3 to that Memorandum, "[r]eaming is an industrial term for inserting a reamer, which is essentially a drill bit or cutting tool, down into the guide and then taking off any excess material so that it's exactly the right dimension to fit over the valve system."   (N.T. 1/25/17, 104; N.T. 1/26/17, 20-21).  In so doing, Continental effectively incorporated the exhaust valve guide into and made it a part of its cylinder assembly.  Since it was the No. 2 cylinder which failed, cascading into the complete failure of the Cessna's engine, and that cylinder was assembled by Continental in December 2003, sold shortly thereafter to Sterling and installed into the aircraft in 2004, this action is not and was not barred by GARA.

   *D.  Use of the Term "Cylinder Assembly"*

   As further grounds for a new trial, Continental asserts that the Court's use of the term "cylinder assembly" in its charge and on the verdict form was erroneous ostensibly because the plaintiffs produced no evidence to support reference to the broader system - *i.e.*, the No. 2 cylinder rather than the exhaust valve guide contained within it.  Again, we disagree.

   As we explained above, the evidence produced at trial evinced that while the No. 2 exhaust valve guide was indeed

manufactured by Roderick Arms & Tool, it was manufactured specifically for and sold only to Continental based on a Continental design and to Continental's specifications and that it bore a Continental part number. (N.T. 1/25/17, 108-109, 137-138; N.T. 2/1/17, 140-143; N.T. 2/8/17, 27, 33-34; Pl's Exhibits 239, 245, 253). The exhaust valve guides were incorporated into and made a part of the cylinder by the reaming in place method. (N.T. 1/25/17, 103-104; N.T. 1/26/17, 20-21; N.T. 2/1/17, 74-76; N.T. 2/3/17, 57-60; N.T. 2/7/17, 42-44).

Furthermore, the trial record also reflects that in advance of performing the 2004 engine overhaul, Sterling ordered and purchased six new cylinder assemblies from Continental - there is no evidence that it ever ordered or purchased exhaust valve guides from Roderick. (N.T. 2/3/17, 82, 104-105). In 2007, when Sterling's annual inspection compression testing of the cylinders revealed that two of the engine's six cylinders failed, it removed those two cylinders and sent them to Penn Yan Aeronautical Services, a nearby engine overhaul facility for closer inspection and repair. (N.T. 2/3/17, 105-106). Penn Yan Aero then repaired the cylinders by replacing, *inter alia*, the exhaust valve guides, ground seats and the intake valves in those cylinders (the No. 3 and No. 5 cylinders) and returned the cylinders to Sterling, which re-installed them into the engine. (N.T. 2/3/17, 107-110, 121-126).

What's more, at various points throughout the trial, Defendant CMI's own counsel and at least one of its expert witnesses *themselves* referred to the part in question as a "Continental" or "CMI guide" and/or as a cylinder assembly. (See e.g., N.T. 2/2/17, 70-72; N.T. 2/8/17, 19, 28, 184, 185) In light of this evidence, we determined that it was appropriate to ask whether the No. 2 cylinder assembly was manufactured by Continental Motors and whether it was added to the aircraft after the 18-year limitation period or after June 21, 1992 on the Verdict Slip. And, after reviewing the trial record, we find no error in that determination and see no reason to grant CMI a new trial on this ground.

   *E. No Duty to Warn About Use of After-Market Parts*

   Continental also claims that the Court's refusal to give an instruction about or to preclude evidence regarding CMI's lack of any obligation to warn about use of after-market components warrants a new trial. We find no merit to this argument either.

   It is of course well-settled that "[a] party is entitled to a jury instruction that accurately and fairly sets forth the current status of the law," and "it is the responsibility of the trial judge to provide the jury with a clear and accurate statement of the law." Douglas v. Owens, 50 F.3d 1226, 1233 (3d Cir. 1995)(citing McPhee v. Reichel, 461 F.2d 947, 950 (3d Cir. 1972). "A court does not err merely because it does not give an

23

instruction in exactly the words a defendant submits, for 'no litigant has a right to a jury instruction of its choice, or precisely in the manner and words of its own preference." <u>United States v. Sussman</u>, 709 F.3d 155, 178 (3d Cir. 2013); <u>De Asencio v. Tyson Foods, Inc.</u>, 500 F.3d 361, 373 (3d Cir. 2007).  "In fact, 'it is [also] well settled that there is no error to refuse to instruct as counsel wishes if the charge to the jury is correct.'" <u>Sussman</u>, <u>supra</u>,(quoting <u>United States v. Blair</u>, 456 F.2d 514, 520 (3d Cir. 1972)).  In determining correctness, the jury instructions are considered as a whole to determine whether they fairly and adequately contain the law applicable to the case.  <u>Koppers Co. v. Aetna Casualty & Surety Co.</u>, 98 F.3d 1440, 1445 (3d Cir. 1996).

The proposed instruction which CMI here avers should have been given reads as follows:

**Failure to Warn - No Duty to Warn with Respect to After-Market Components**

An after-market component is a replacement part or accessory that is sold to enhance or replace an original component in the secondary market.

The Federal Aviation Regulations only require a manufacturer of aviation components to issue instructions and warnings about components that the manufacturer actually manufactures itself.  An original equipment manufacturer has no duty or obligation to provide instructions or warnings about after-market components that are manufactured or sold by other manufacturers.

Additionally, a manufacturer of aircraft engines only has a duty to provide adequate instructions and warnings to owners and FAA-certified mechanics, not directly to aircraft

pilots or passengers.

**14 CFR 21.50**

Instead, the following, general failure to warn instruction was given:

> I further instruct you, members of the jury, that even a perfectly made and designed product may be defective if not accompanied by proper warnings and instructions concerning its use.
>
> A supplier must give the user or consumer any warnings and instructions to enable the consumer to safely use the products for its intended purpose.
>
> If the product carries with it some degree or inherent risk when used for its intended purpose, the supplier must adequately warn the consumer of the inherent risk.
>
> I further instruct you, members of the jury, if you find that there were warnings or instructions required to make the cylinder assembly non-defective, which were adequately provided by Continental Motors, then you may not find for these defendants based on a determination that even if there had been an adequate warning or instructions, Sterling Airways would not have read or heeded them.
>
> Instead, the law presumes, and you must presume, that if there had been an adequate warning or instruction, Sterling Airways would have found them.

(N.T. 2/15/17, 144-145).

We find the instruction given to have been an accurate statement of the applicable law and wholly appropriate given the evidence that was produced throughout the trial. See, e.g., Pa. S. S. J. I. §§ 8.02, 8.03; Berkebile v. Brantly Helicopter Corp., 462 Pa. 83, 100, 103, 337 A.2d 893, 902, 903 (1975); Walton v. Avco Corp., 383 Pa. Super. 518, 557 A.2d 372 (1989). And, since we were unable to discern the correctness of the proposed charge

from the authority cited therefor,[9] we do not find any error in

---

[9]   Local Rule of Civil Procedure 16.1(d)(4)(a) provides in relevant
part:

   (a) Requests for Jury Instructions.  Requests for jury instructions are
   not required with respect to familiar points of law not in dispute
   between the parties.  As to such matters, counsel should consider simply
   listing the subject desired to be covered in the charge (e.g.
   negligence, proximate cause, assumption of risk, burden of proof,
   credibility, etc.), unless specific phraseology is deemed important in
   the particular case.  With respect to non-routine legal issues, requests
   for instructions should be accompanied by appropriate citations of legal
   authorities. ...

   In this case, Continental cited 14 CFR §21.50 as its authority for the
requested failure to warn charge.  That regulation reads quite differently
than the proposed charge:

   § 21.50 Instructions for continued airworthiness and manufacturer's
   maintenance manuals having airworthiness limitations sections.

   (a) The holder of a type certificate for a rotorcraft for which a
   Rotorcraft Maintenance Manual containing an "Airworthiness Limitations"
   section has been issued under § 27.1529(a)(2) or § 29.1529(a)(2) of this
   chapter, and who obtains approval of changes to any replacement time,
   inspection interval, or related procedure in that section of the manual,
   must make those changes available upon request to any operator of the
   same type of rotorcraft.

   (b) [Effective until Aug. 30, 2017.] The holder of a design approval,
   including either the type certificate or supplemental type certificate
   for an aircraft, aircraft engine, or propeller for which application was
   made after January 28, 1981, must furnish at least one set of complete
   Instructions for Continued Airworthiness to the owner of each type
   aircraft, aircraft engine, or propeller upon its delivery, or upon
   issuance of the first standard airworthiness certificate for the
   affected aircraft, whichever occurs later.  The Instructions must be
   prepared in accordance with §§ 23.1539, 25.1529, 27.1529, 29.1529,
   31.82, 33.4, 35.4, or part 26 of this subchapter, or as specified in the
   applicable airworthiness criteria for special classes of aircraft
   defined in § 21.17(b), as applicable.  If the holder of a design
   approval chooses to designate parts as commercial, it must include in
   the Instructions for Continued Airworthiness a list of commercial parts
   submitted in accordance with the provisions of paragraph (c) of this
   section.  Thereafter, the holder of a design approval must make those
   instructions available to any other person required by this chapter to
   comply with any of the terms of those instructions.  In addition,
   changes to the Instructions for Continued Airworthiness shall be made
   available to any person required by this chapter to comply with any of
   those instructions.

   (c) To designate commercial parts, the holder of a design approval, in a
   manner acceptable to the FAA, must submit:

   (1) a Commercial Parts List;

our decision to decline to give CMI's requested charge and to instead give a standard instruction.

Moreover, the after-market part upon which Continental premises its complaint here was the single-piece Superior bushing which was found in the accident aircraft's engine. At trial, CMI produced expert testimony that the cause of the accident was inadequate lubrication to the exhaust valve guide of the No. 2 cylinder, which caused the engine to run dangerously hot thereby resulting in excessive wear. (N.T. 2/6/17, 127-129). According to Continental's expert James Brogden, this overheating and engine breakdown directly resulted from the installation of the after-market single-piece rocker arm bushings during the 2004 overhaul. (N.T. 2/6/17, 139, 155-156).

In rebuttal of this theory, Plaintiffs' expert Colin Sommer testified that according to Service Bulletin 97-6, the rocker arm bushing was a part which was required to be replaced during the 2004 overhaul and according to the parts catalog, the Superior bushing was an approved after-market replacement part for the Continental two-piece bushing (part #639629). (N.T. 1/26/17,

---

(2) Data for each part on the List showing that:

    (i) The failure of the commercial part, as installed in the product, would not degrade the level of safety of the product; and

    (ii) The part is produced only under the commercial part manufacturer's specification and marked only with the commercial part manufacturer's markings; and

(3) Any other data necessary for the FAA to approve the List.

135-138).  At no time did Continental issue a direction of any
kind that aircraft owners, operators or mechanics should not use
the FAA, PMA-approved single piece Superior bushing with the non-
squirt hole rocker arm configuration in the TSIO-520-H engine.
(N.T. 1/26/17, 139).  Nor, in its 2010 report to the NTSB
regarding this accident, did CMI report that there was any lack
of lubrication in any of the cylinders in the accident aircraft's
engine and made no mention of anything being wrong with the
rocker arms or lifters.  (N.T. 2/6/17, 45-48).  Thus, because
the theory of the after-market part was raised by Continental and
because the gist of this theory was not a defect in the Superior
bushing itself but rather that it should not have been used with
the rocker arm configuration in the engine, we determined that
the charge requested by CMI was not appropriate and if given,
would have had the effect of confusing the jury.  We stand by
that determination and therefore again deny CMI's request for a
new trial on this ground.

   *F.  Allegedly Improper Evidentiary Rulings*

   Continental next argues that a new trial should be granted
for the reason that a series of purported unfair and erroneous
evidentiary rulings had the cumulative effect of causing it such
prejudice that a miscarriage of justice will result if the jury's
verdict is allowed to stand.  Again, we respectfully disagree.

   "A motion for a new trial, of course, may be grounded on an

allegation that evidence was admitted or excluded improperly
during the course of a trial and that such error prejudiced the
moving party's rights to a fair trial." Peterson v. Valmar S. S.
Corp., 296 F. Supp. 8, 11 (E.D. Pa. 1969). "There is, however,
no precise formula to guide a court in deciding such a motion,"
and "[a]t best, a court may employ the standard set forth in Rule
61 of the Federal Rules of Civil Procedure." Id. That Rule
states:

> Unless justice requires otherwise, no error in admitting or
> excluding evidence - or any other error by the court or a
> party - is ground for granting a new trial, for setting
> aside a verdict, or for vacating, modifying, or otherwise
> disturbing a judgment or order. At every stage of the
> proceeding, the court must disregard all errors and defects
> that do not affect any party's substantial rights.

Fed. R. Civ. P. 61.

Generally, a wide range of discretion rests with the
district court in granting or denying a motion for a new trial.
McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556,
104 S. Ct. 845, 850, 78 L. Ed.2d 663 (1984)(citing Montgomery
Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S. Ct. 189, 194, 85
L. Ed. 147 (1940)); Kremser v. Keithan, 56 F.R.D. 88, 91 (M.D.
Pa. 1972). Likewise, the application of a particular rule of
evidence by a district court is reviewed under an abuse of
discretion standard. Sharif v. Picone, 740 F.3d 263, 267 (citing
United States v. Balter, 91 F.3d 427, 437 (3d Cir. 1996)). Even
where there may be multiple trial errors in a case, multitude of

error alone is not a sufficient ground for reversal inasmuch as "[t]he Federal Rules require that a court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Lockhart v. Westinghouse Credit Corporation, 879 F.2d 43, 57 (3d Cir. 1989)(quoting Fed. R. Civ. P. 61). Thus, if *each* error is harmless, there is no basis for concluding that substantial rights were violated. Id. And, through it all, the Courts should remain mindful that "a litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials." McDonough Power Equipment, 464 U.S. at 553, 104 S. Ct. at 848(quoting, *inter alia*, Brown v. United States, 411 U.S. 223, 231-232, 93 S. Ct. 1565, 1570-1571, 36 L. Ed. 2d 208 (1972)).

　　1.　Preclusion of NTSB and Other Factual Reports

　　Under 49 U.S.C. §1154(b), "[n]o part of a report of the Board, related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report." Inasmuch as this Title concerns the National Transportation Safety Board, it is axiomatic that within the meaning of this Section, "Board" is the NTSB. However, "[f]ederal regulations differentiate between a 'board accident report,' defined as 'the report containing the Board's determinations, including the probable cause of an accident, issued either as a narrative

30

report or in a computer form,' and a 'factual accident report,'
defined as a 'report containing the results of the investigator's
investigation of the accident.'" <u>In re Paulsboro Derailment</u>
<u>Cases</u>, Master Dkt. No. 13-784, 2015 U.S. Dist. LEXIS 88899 at
*17-*18, (D. N.J. July 9, 2015)(quoting 49 C.F.R. §835.2).  As
further noted by Judge Kugler in <u>Paulsboro</u>,

> ... The regulations also provide that "no part of a Board
> accident report may be admitted as evidence or used in any
> suit or action for damages growing out of any matter
> mentioned in such reports."  By contrast, "there is no
> statutory bar to admission in litigation of factual accident
> reports." ... Circuit courts around the country have held
> that the language of the statute "means what it says: No
> part of the Board's actual report is admissible in a civil
> suit."  <u>Id</u>, at *18(quoting 49 C.F.R. §835.2 and <u>Chiron Corp.</u>
> <u>and Perseptive Biosystems, Inc. v. National Transportation</u>
> <u>Safety Board</u>, 198 F.3d 935, 941, 330 U.S. App. D.C. 188
> (D.C. Cir. 1999) and citing <u>Campbell v. Keystone Aerial</u>
> <u>Surveys, Inc.</u>, 138 F.3d 996, 1001 (5th Cir. 1998); <u>Thomas</u>
> <u>Brooks v. Burnett</u>, 920 F.2d 634, 639 (10th Cir. 1990); <u>Benna</u>
> <u>v. Reeder Flying Serv., Inc.</u>, 578 F.2d 269, 271 (9th Cir.
> 1978) and <u>In re Jacoby Airplane Crash Litigation</u>, No. 99-
> 6073, 2007 U.S. Dist. LEXIS 69291 (D.N.J. Sept. 19, 2007)).

Here, Continental complains that the Court refused admission
into evidence of the NTSB Factual Report in its entirety but
nevertheless permitted some portions of the NTSB docket and CMI's
Engine Analysis Report to be admitted into evidence.  This Court
permitted admission of those portions of the docket which were
exclusively factual in nature, such as what Sterling Airways and
Continental told the investigators was or was not done, and those
which were largely undisputed such as the flight path of the
accident aircraft.  The report and those portions of the docket

which were excluded contained opinions and/or conclusions of the NTSB investigators and/or otherwise inadmissible hearsay. See, e.g., Fed. R. Evid. 803(8). Evidence of CMI's Engine Analysis Report were admissible as a statement of an opposing party and therefore was not hearsay under Fed. R. Evid. 801(d)(2). Insofar as we discern no error in this decision, we deny CMI's motion for new trial on the basis of this evidentiary ruling.

2. Fairness and Impartiality of Evidentiary Rulings

CMI next alleges generally that the Court's evidentiary rulings were unfair and inconsistent and that the Court's rulings showed partiality in favor of the Plaintiffs and Defendant Sterling Airways. In addition to re-asserting its contention with regard to the unjust preclusion of the NTSB Factual Report, Continental claims that the U.S. Forest Service Report was also unfairly precluded. More particularly, Continental claims that while "Sterling and Plaintiffs were given great latitude to discuss *one* factual report, or *one portion* of the NTSB's factual investigation of the accident, but [it] was not permitted to cross-examine the witness about any other portion." (CMI's Brief in Support of Support of Motion for New Trial and to Alter or Amend Judgment, p. 29)(emphasis in original).

Here again after reviewing the reports in question and the pertinent portions which were sought to be admitted, the Court determined that the probative value and relevance of the contents

was exceeded by its potential for undue prejudice and that to admit the reports themselves would have allowed the introduction of inadmissible hearsay. While CMI makes much of the fact that a number of Plaintiffs' experts allegedly relied upon the reports in reaching their conclusions, the record reflects that in reality, the experts merely acknowledged that they had reviewed the materials as part of their preparation of the case. (See, e.g. N.T. 1/26/17, 182-185). Moreover, much of the contents of both the United States Forest Service and NTSB Factual reports was opinion and conclusions.[10] Because it was the jury which was charged with determining what the cause of the accident was and which of the parties, if any, bore responsibility, we can find no abuse of discretion in deciding to exclude the materials at issue.

3. The Court's Jury Instruction to Disregard All NTSB Factual Findings and Conclusions

Next, CMI alleges that the giving of the following instruction to the jury operated to compound the harm and prejudice which it purportedly sustained:

Members of the jury, during this trial you may have heard references to the United States Forest Service Aircraft Investigation Report, and the National Transportation Safety Board report.

---

[10] Furthermore, on cross-examination, CMI's counsel specifically asked Mr. Sommer: "[i]sn't it true that the U.S. Forest Service found that the aircraft was not airworthy on the day of the crash?" (N.T. 1/26/17, 184). Any prejudice which CMI may have suffered by the Court's refusal to permit the U.S.F.S. Report is therefore minimal at best and certainly not of the magnitude necessary to warrant throwing out the verdict.

> I hereby instruct you, members of the jury, that you cannot
> consider any factual findings and conclusions of these
> reports in your deliberations.  These reports have not been
> admitted into evidence, are not evidence in this case and
> cannot be considered by you.  Is that understood?

(N.T. 2/15/17, 111).

Given our finding that the decision to preclude these materials was an appropriate exercise of our discretion, we cannot find that the giving of this instruction constituted reversible error either.

### 4. Preclusion of Terry Horton's Testimony Concerning Oil Analysis Findings

Continental also complains that one of its expert witnesses, Terry Horton, was precluded from explaining to the jury the significance of oil analysis results and specifically what Sterling would have discovered if it had done the testing pursuant to CMI's service instructions.

As is clear from the record, Mr. Horton was permitted to testify about oil analysis trend monitoring, but he was precluded from explaining to the jury what oil analysis is and offering expert opinion as to what such testing would have shown had it been performed by Sterling Airways.  (N.T. 2/13/17, 20, 82-85).  Mr. Horton was precluded from so testifying because that proposed testimony and opinion evidence was not included in his expert reports and thus Sterling did not have the opportunity to prepare to cross-examine him or to otherwise rebut that testimony at

trial. (N.T. 2/13/17, 3-21). Inasmuch as we believe that this decision was appropriate to prevent unfair prejudice, we decline to grant Continental a new trial on this ground. See, generally, Fed. R. Evid. 403.

    5. Colin Sommer's Testimony on Metallurgical Processes

    Continental next claims that the Court erred by permitting Colin Sommer to testify as an expert on metallurgical processes insofar as he was offered only as an expert in the field of aircraft accident investigation. Once again, we find no error in Mr. Sommer's testimony.

    By his own admission, Mr. Sommer is not a metallurgist, but rather a mechanical engineer, although he was designated at least once before to give metallurgical opinions in a case concerning the crash of an aircraft with a Lycoming engine and wrote the chapters on metallurgy in a textbook on helicopter accident investigations. (N.T. 1/25/17, 52-53). Mr. Sommer was also at the metallurgical laboratory when the testing in this case was being done. (N.T. 1/25/17, 53). Although his testimony did at various points make reference to the various materials and alloys which were used to make the exhaust valve guides and the temperatures at which those materials could be expected to soften, it is clear from a reading of his testimony as a whole that in rendering his opinions, he was relying on the work of the other experts and/or his own experience and that he was not

testifying as a metallurgical expert. (N.T. 1/25/17, 55, 141, 150-155). "There is no prohibition against an expert relying upon the work of another expert so long as the expert is otherwise qualified." In re Processed Egg Products Antitrust Litigation, No. 08-md-2002, 2016 U.S. Dist. LEXIS 93543 at *3 (E.D. Pa. July 18, 2016)(citing In re Zoloft Products Liability Litigation, 26 F. Supp. 3d 466, 470 (E.D. Pa. 2015); Leese v. Lockheed Martin Corp., 6 F. Supp. 3d 546, 553 (D. N.J. 2014); IBEW v. Local 380 Pension Fund v. Buck Consultants, Civ. A. No. 03-4932, 2008 U.S. Dist. LEXIS 43435 at *8 - *9 (E.D. Pa. June 3, 2008). Here there is no question but that the other experts upon whom Mr. Sommer relied – Mr. Carden and Mr. Seader in particular, were well qualified. We find no reversible error in the admission of this testimony.

6. CMI's Remaining Claims of Error

In addition to all of the arguments addressed above, Continental also assigns as reversible error the Court's decisions to allow the following into evidence:

> a) evidence concerning CMI's Certificates of Compliance, service difficulty reports, third-party shop orders and warranty claims; and

> b) testimony about a magazine survey of cylinders by various manufacturers.

The gist of CMI's argument with respect to the admission of this evidence is that this evidence was irrelevant, prejudicial unhelpful and confusing to the jury. This Court respectfully

disagrees. To the contrary, we found this evidence to be wholly relevant and not unfair or unduly prejudicial to the interests of CMI and after reviewing the trial record, we continue to so find. Insofar as CMI has not made the requisite showing of an abuse of this Court's discretion in permitting the admission of this evidence, it is not entitled to a new trial on this ground either.

G. *Motion to Clarify, Alter or Amend the Judgment*

Finally, CMI urges this Court to Amend the Judgment which was formally entered on the docket of this matter on February 21, 2017 to dispose of the cross-claims filed on its and Sterling's behalf against one another. In light of the jury's verdict in favor of the Plaintiffs and against Defendant Continental only, we agree that the competing cross-claims of the Defendants for liability over, indemnity and contribution are effectively moot. Amendment of the verdict shall be accomplished by a separate Order.

## Conclusion

For all of the reasons outlined in the preceding pages, we do not find that Continental is entitled to a new trial in this matter and its Motion therefor is DENIED.

An Order follows.